**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **I.O.**, *et al.*, | * | |
| **PLAINTIFFS,** | * | |
| **v.** | * | **Case No.: PWG-16-3866** |
| **JACK R. SMITH**, *et al.*, | * | |
| **DEFENDANTS.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

I.O. ("Student") is a "thirteen-year-old girl who has been diagnosed with Autism, Epilepsy, a Speech and Language Disorder, and Attention Deficit/Hyperactivity Disorder ('ADHD')." Jt. Stmt. Facts 1, ECF No. 42. Because of this diagnosis, I.O. is "eligible for special education services by Montgomery County Public Schools ('MCPS' or 'the school system'), under the IDEA,[1] as a student with an Other Health Impairment ('OHI')." *Id.* Yet she has attended private special education schools since she moved to Montgomery County, Maryland in 2013 with her parents, J.O. and E.O. ("Parents"). *Id.* at 1–2.

In August 2015, while I.O. was a student at the Ivymount School ("Ivymount"), a private special education school, the Parents met with representatives from MCPS to develop an individualized education program ("IEP") for I.O. and to determine her school placement. Jt. Stmt. Facts 2. Ultimately, the Central IEP ("CIEP") team, including the Parents, met on October 23, 2015 and finalized I.O.'s IEP (the "2015–2016 IEP"). 2015–2016 IEP & Oct. 29, 2015 Prior Written Notice, P-47; MCPS Oct. 23, 2015 IEP Mtg. Notes, P-48. The 2015–2016 IEP required

---

[1] Individuals with Disabilities Education Improvement Act, 20 U.S.C. §§ 1400 *et seq.*

"full-time self-contained special education in a small setting with behavior support and one hour per week of Speech and Language services, and one-to-one adult support for aggression across all academic areas." Jt. Stmt. Facts 3. Notably, it did not require behavioral data collection at specified intervals, such as the data collection every five minutes that I.O.'s one-to-one dedicated aid at Ivymount provided, and to which the Parents attributed the progress I.O. had made. Compl. ¶¶ 19–20, ECF No. 1 (sealed), ECF No. 5 (redacted). Nonetheless, the Parents agreed to it. Jt. Stmt. Facts 3.

At that meeting, MCPS decided to place I.O. at Carl Sandburg Learning Center ("Carl Sandburg"), which is a self-contained public school within MCPS. *Id.* The Parents did not agree, believing that only Ivymount could meet I.O.'s needs. *Id.* The Parents kept the Student at Ivymount for the 2015–2016 school year instead, and they sought review of the placement (though not the IEP itself) by an administrative law judge ("ALJ"). *Id.* at 4. The ALJ concluded that the Student's 2015–2016 IEP and placement at Carl Sandburg were reasonably calculated to provide her with a free appropriate public education ("FAPE") in the least restrictive environment. Aug. 5, 2016 ALJ Dec. 3, 24, 51; *see* June 20–21, 2016 Tr.; July 6–8, 2016 Tr.; July 11–12, 2016 Tr.

The Parents and the Student, by and through her Parents, filed this lawsuit against Jack R. Smith in his official capacity as Superintendent of MCPS and Montgomery County Board of Education ("the Board"). Compl., ECF No. 1 (sealed), ECF No. 5 (redacted). They ask the Court to reverse the ALJ's decision because, in their view, it is erroneous due to the ALJ's refusal to consider certain evidence, her assessment of witnesses, and the findings she reached. Compl. ¶¶ 1, 62–72. Plaintiffs claim that Defendants failed to provide I.O. with the FAPE to which she is entitled under the IDEA. *Id.* ¶¶ 1, 6.

While this case was pending, the Supreme Court issued its opinion in *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017). At Plaintiffs' request, ECF Nos. 20, 22, and to promote judicial economy, I remanded the case for consideration in light of *Endrew F*. ECF No. 25. The ALJ issued a Decision on Remand on August 15, 2017, reaching the same conclusion that the Student's 2015–2016 IEP and placement were reasonably calculated to provide her with a FAPE in the least restrictive environment. ALJ Dec. on Remand 3, 26, 54.

The parties filed cross-motions for summary judgment, ECF Nos. 41, 43, as well as a Joint Statement of Undisputed Facts, ECF No. 42.[2] Giving due weight to the ALJ's factual findings and from my own *de novo* review of the entire record, I find that I.O.'s placement at Carl Sandburg was appropriate and reasonably calculated to provide her with a FAPE. Accordingly, I conclude that Plaintiffs are not entitled to judgment as a matter of law and Defendants are. Therefore, I will deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and close this case.

## Free Appropriate Public Education

Children with disabilities are entitled to a free appropriate public education, or "FAPE," pursuant to the IDEA. 20 U.S.C. § 1412(a)(1)(A). Maryland regulations also "govern[] the provision of FAPEs to children with disabilities in accordance with the IDEA." *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014) (citing Md. Code Regs. Tit. 13A, § 05.01). A FAPE "includes both 'special education' and 'related services,'" which "are the support services 'required to assist a child . . . to benefit from'" instruction tailored to his or her needs. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994

---

[2] The parties have fully briefed their cross-motions for summary judgment. ECF Nos. 41, 43-1, 46, 47; *see also* ECF Nos. 48, 49 (filings regarding supplemental authority). A hearing is not necessary. *See* Loc. R. 105.6.

(2017) (quoting 20 U.S.C. § 1401(9); citing 20 U.S.C. §§ 1401(26), (29)). The public school system must provide "related services 'in conformity with the [child's] individualized education program,' or IEP." *Id.* (quoting § 1401(9)(D)).

A FAPE is an education that provides "meaningful access to the educational process" in "the least restrictive environment" and is "reasonably calculated to confer 'some educational benefit'" on the child with a disability. *Id.* (citing *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982)). "The benefit conferred . . . must amount to more than trivial progress," but "[t]he IDEA does not require that a school district provide a disabled child with the best possible education . . . ." *Id.* (citing *Rowley*, 458 U.S. at 192; *Reusch v. Fountain*, 872 F. Supp. 1421, 1425 (D. Md. 1994)). Rather, a school must provide an Individualized Education Program ("IEP") that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999 (noting that "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal").

To this end, each child with a disability must have an IEP that "state[s] the student's current educational status, annual goals for the student's education, which special educational services and other aids will be provided to the child to meet those goals, and the extent to which the child will be 'mainstreamed,' i.e., spend time in regular school classroom with non-disabled students." *M.C.*, 2014 WL 7404576, at *1 (citing 20 U.S.C. § 1414(d)(1)(A)); *see Endrew F.*, 137 S. Ct. at 994.

> The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe,* 484 U.S. 305, 311 (1988). A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures. [20 U.S.C.] § 1414(d)(1)(B) (internal quotation marks omitted).

These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. § 1414. The IEP is the means by which special education and related services are "tailored to the unique needs" of a particular child. *Rowley,* 458 U.S., at 181.

*Endrew F.*, 137 S. Ct. at 994. If the IEP team members disagree about the contents of an IEP, they can try to "resolve their differences informally, through a '[p]reliminary meeting,' or, somewhat more formally, through mediation," and if they do not reach agreement, they can participate in "a 'due process hearing' before a state or local educational agency." *Id.* (quoting 20 U.S.C. §§ 1415(e), (f)(1)(A), (B)(i), (g)). Then, "the losing party may seek redress in state or federal court." *Id.* (citing 20 U.S.C. § 1415(i)(2)(A)).

In Maryland, parents may voice disagreement with their children's proposed IEPs and request due process hearings before the Maryland Office of Administrative Hearings to address their concerns. *See M.C.*, 2014 WL 7404576, at *2 (citing 20 U.S.C. § 1415(b)(6), (f); Md. Code Ann., Educ. § 8–413; Md. Code Regs. Tit. 13A, § 05.01.15(C)(1)). "Any party can then appeal the administrative ruling in federal or state court." *Id.* (citing Educ. § 8–413(h)). Additionally, parents may place their children in a private school that is "appropriate to meet the child's needs" and "seek tuition reimbursement from the state," but only "if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." *Id.* (quoting Title 20 § 1412(a)(1)(C)(iii); citing *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985)) (emphasis from *M.C.* removed).

## **Background**[3]

Much of the background to this case is undisputed, and the parties provided it to the Court in their Joint Statement of Undisputed Facts.[4]

> I.O. previously attended public school in Portland, Oregon and received services pursuant to an Individualized Education Program ("IEP"), under the classifications of Speech/Language Impairment and Other Health Impairment. I.O.'s family moved to Maryland in 2013 and began the special education eligibility process with MCPS in June 2013. The MCPS team found I.O. eligible as a student with an OHI due to her ADHD and seizure disorder. In October 2013, MCPS drafted an IEP and proposed placement at DuFief Elementary School in the Learning Center.
>
> The parents did not enroll I.O. at Dufief. For the 2013-2014 year, the parents privately placed I.O. at the Katherine Thomas School ("KTS"), in Rockville, Maryland. KTS is a private special education school.

Jt. Stmt. Facts 1–2 (citations to record omitted). The Parents believed it "was apparent . . . that she was not making much behavioral or educational progress" at KTS, as "[s]he was very disruptive in and out class and was not available for learning," Compl. ¶ 15.

> I.O. attended second grade at KTS and was eventually provided the support of a one-to-one dedicated aide to help manage her behavioral difficulties. On December 22, 2015, KTS released the parents from their contract. On January 15, 2015, I.O. began at Ivymount in the Lower School Multiple Needs Program.

Jt. Stmt. Facts 2 (citations to record omitted). Ivymount provided "full-time specialized instruction, small classrooms with high student-to-teacher ratios, weekly structured play groups, social skills groups, and life skills programming" for "students with a variety of cognitive, academic and behavioral needs." Compl. ¶¶ 17–19. It also provided the Student with

---

[3] Where, as here, the Court is presented with cross-motions for summary judgment, the facts relevant to each motion must be considered in the light most favorable to the nonmovant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

[4] The parties separately identify additional facts that they deem material, which I address in the Discussion section of this Memorandum Opinion and Order. "P-" indicates an exhibit that Plaintiffs presented at the hearing; "MCPS-" indicates an exhibit that MCPS presented at the hearing.

"speech/language therapy sessions" and "a dedicated one-to-one aide whose primary responsibility is to collect data every five minutes on I.O.'s behaviors, their causes, and successful solutions." *Id.* ¶¶ 18–19. The Parents believed that I.O. was making progress at Ivymount. *Id.* ¶¶ 19–20. They attributed the progress to Ivymount's behavioral programming, and specifically the one-to-one dedicated aide and frequent data collection. *Id.*

In May 2015, I.O. underwent a neuropsychological evaluation by Dr. Anne Inge at the Children's National Medical Center. I.O.'s neuropsychological profile revealed delayed cognitive abilities, executive dysfunction, motor deficits, and social learning deficits. Dr. Inge concluded that I.O. met the criteria for an Autism Spectrum Disorder based on social communication and interaction deficits. She also confirmed that I.O. continues to meet the criteria for a severe Speech/Language Disorder and ADHD, Combined Presentation. Dr. Inge recommended that I.O. attend a "highly specialized, special education placement that includes therapeutic supports and highly individualized special education instruction." At the end of the 2014-2015 school year, I.O.'s parents contacted MCPS and requested that the school system begin the special education process once again. Her parents met with the IEP team at her home school, Ashburton Elementary School ("Ashburton"), to develop an IEP for the 2015-16 school year. At the meeting in August 2015, the Ashburton team determined that it could not meet I.O.'s needs and referred her file to the MCPS Central Office for determination of placement.

In September 2015, the parents hired an educational consultant, Dr. Laura Solomon. On October 6, 2015 and October 23, 2015, the parents, Dr. Solomon, and the Ivymount staff met with the MCPS Central IEP ("CIEP"), team to discuss I.O.'s IEP and placement.

At the final CIEP meeting, the team reviewed the IEP and agreed to its proposal of full-time self-contained special education in a small setting with behavior support and one hour per week of Speech and Language services, and one-to-one adult support for aggression across all academic areas. When the discussion of placement arose for the 2015-2016 year, the team could not reach consensus. Dr. Solomon and I.O.'s parents requested placement at Ivymount. The MCPS chairperson, George Moore, raised Carl Sandburg Learning Center ("Carl Sandburg"), a self-contained public school in MCPS, as an option. Ms. Middleton, MCPS Psychologist for Carl Sandburg, reported that the IEP could be implemented at Carl Sandburg. Kimberly Frazier, MCPS Placement Specialist, had concerns about I.O.'s transition and was conflicted, but believed the IEP could be implemented at Carl Sandburg The MCPS psychologist from Ashburton, Kristie Kim, who had observed I.O. at Ivymount, stated that she was concerned about the level of support at Carl Sandburg and whether they could deliver enough support to meet I.O.'s needs. After the discussion, MCPS

recommended placement at Carl Sandburg.  The parents noted their disagreement with the decision.

After the CIEP meeting, Ms. Kim observed at Carl Sandburg to gain additional information about the program, as she had not previously visited Sandburg.  After the visit, she remained concerned about the level of support required by I.O.

Dr. Solomon and Mrs. O. observed the program at Carl Sandburg on October 30, 2015.  During the visit, they spoke with Carl Sandburg's Principal, Ms. Marlene Kenny, and visited 4th and 5th grade classes.  Dr. Solomon expressed her opinion that Carl Sandburg was not an appropriate placement for I.O.  On March 7, 2016, the parents filed a due process hearing request, appealing the decision of the CIEP team to place I.O. at Carl Sandburg. A due process hearing was held on June 20 and 21, July 6 through 8, 11 and 12, 2016. The issue at the hearing was whether the IEP and placement developed by MCPS for the 2015-2016 school year was reasonably calculated to provide I.O. with a free appropriate public education, and, if not, whether tuition reimbursement for the 2015-2016 [and 2016–2017] school year[s] at Ivymount is appropriate.

At the due process hearing, the parents presented evidence and testimony from Dr. Laura Solomon, an expert in special education and the family's educational consultant; Kristie Kim, an expert in school psychology and an MCPS school psychologist; Marlene Kenny, Principal of Carl Sandburg; Fonda Lowe, an expert in speech/language pathology and Director of Ivymount School Multiple Learning Needs Program; the father; and Megan Boucher, an expert in behavioral analysis and a Clinical Coordinator and Behavioral Analyst for Ivymount. The school system presented evidence and testimony from George Moore, an expert in special education with an emphasis on educational placement of special needs students, and Ms. Marlene Kenny, an expert in special education and the Principal of Carl Sandburg.

Jt. Stmt. Facts 2–4 (citations to record omitted); *see* Req. for Admin Hr'g 8.

The ALJ issued a 51-page Decision on August 5, 2016 and a 55-page Decision on Remand on August 15, 2017.  As noted, she concluded both times that the Student's 2015–2016 IEP and placement were reasonably calculated to provide her with a FAPE in the least restrictive environment.  ALJ Dec. on Remand 3, 26, 54.  I will discuss her findings of fact and conclusion of law in detail below.  Dissatisfied with the initial Decision, Plaintiffs filed suit in this Court, Compl., and the parties filed the pending cross-motions summary judgment.

## **Standard of Review**

In reviewing cross-motions for summary judgment in an IDEA action, the "'reviewing court is obliged to conduct a modified *de novo* review'" of the administrative record, "'giving "due weight" to the underlying administrative proceedings.'" *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *6 (D. Md. Dec. 29, 2014) (quoting *M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 530–31 (4th Cir. 2002) (citing *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982)).  This means that when an ALJ makes findings of fact "in a regular manner and with evidentiary support," those findings "are entitled to be considered *prima facie* correct," and "the district court, if it is not going to follow them, is required to explain why it does not."  *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991); *see N.P. v. Maxwell*, 711 F. App'x 713, 718 (4th Cir. 2017); *M.C.*, 2014 WL 7404576, at *6–7. The Court then reaches its decision based on the preponderance of the evidence.  *Rowley*, 458 U.S. at 205.  Yet, the Court cannot "substitute [its] own notions of sound educational policy for those of local school authorities." *M.C.*, 2014 WL 7404576, at *6–7 (quoting *M.M.*, 303 F.3d at 530–31 (quoting *Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir. 1997))). The burden of proof is on Plaintiffs as the party seeking relief. *See Barnett v. Fairfax Co. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991), *cert. denied*, 502 U.S. 859 (1991).

"This standard works in tandem with the general standard of review for summary judgment, which also applies in IDEA cases . . . ."  *M.C.*, 2014 WL 7404576, at *7.  Thus, summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials,"

that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986).

## Discussion

### *Exhaustion*

In this lawsuit, Plaintiffs challenge not only I.O.'s placement but also the extent of one-to-one aide support provided for in the 2015–2016 IEP. Pls.' Mem. 22; *see* Compl. ¶¶ 55–58. They allege that I.O. needs the one-to-one support she receives at Ivymount, which includes support during transitions, as well as academics, and not only to address aggression; they also claim that part of the necessary support is data collection every five minutes, as Ivymount provides. Compl. ¶¶ 55–58; *see* Pls.' Mem. 22. MCPS argues that Plaintiffs failed to exhaust the issue of the level of one-to-one aide support in the IEP because they did not raise it in their Due Process Complaint. Defs.' Opp'n & Cross-Mot. 33–34. Indeed, it is undisputed that Plaintiffs did not raise this issue in their Due Process Complaint. *See* Due Process Complaint, P-1 (addressing placement only); Jt. Stmt. Facts 4 ("On March 7, 2016, the parents filed a due process hearing request, appealing the decision of the CIEP team to place I.O. at Carl Sandburg."); Compl. ¶ 49 ("On March 7, 2016, the parents filed a due process hearing request, appealing the decision of the CIEP team to place I.O. at Carl Sandburg."). And, when the ALJ sought to "clarify the issue before [her]" at the hearing and "make sure there wasn't another aspect of the IEP [other than placement] that was under contention," June 20, 2016 Tr. 7:22–25,

10:3–4, Plaintiffs' counsel stated that while Plaintiffs "raise issues about" the "process of the IEP and the CIEP meeting," they "are not attacking the IEP that, that exists," *id.* at 10:5–7, 23–24. Plaintiffs' counsel asserted that Plaintiffs "might . . . think it could have been better, but [they were] not attacking it." *Id.* at 11:1–2.

Nonetheless, Plaintiffs assert that they raised the issue later in the due process hearing and insist that their mid-hearing argument was sufficient to preserve the issue. Pls.' Reply & Opp'n 16. They argue that "the issue only came to light fully at the due process hearing through testimony of witnesses," and that "defendants provide no support for the argument that issues not specifically raised in [a] due process hearing request, but revealed at hearing, cannot be considered by an ALJ or this Court." *Id.* According to Plaintiffs, "[t]he testimony at hearing confirmed that pursuant to the MCPS IEP, the same level of one-to-one support [that I.O. received at Ivymount] was *not* specifically proposed for I.O." Pls.' Mem. 22. Noting that "[t]he IEP calls for '1:1 adult support for aggression' daily and across all *academic settings*," they insist that "[i]t does not provide one-to-one support during non-academic times nor does it specify that I.O. requires the same level of support for anything other than aggression." *Id.* (citing Oct. 23, 2015 IEP & Oct. 29, 2015 Prior Written Notice, P-47, at 23). Plaintiffs state that, "at hearing, Mr. Moore[5] tried to clarify his understanding of the one-to-one aide, testifying that it was not

---

[5] Mr. Moore "is the coordinator of the placement and assessment services unit of school-aged population" at MCPS. July 7, 2016 Tr. 847:20–22. His "primary function is to serve as the chairperson of the central individualized education program team, or the LEA representative, local education agency, representative." *Id.* at 850:3–6. He testified:

> In that role I chair about 95 percent of all the central IEP team meetings. There are two other chairpersons who chair one day a month and the rest of the days are reserved for me.

> I also serve as the support person and to five placement specialists who monitor 560 – actually 555 students in private placements. And I consult with them on IEP development, the IEPs that are developed by their schools, behavior

actually for aggression, but for I.O.'s anticipated transition from Ivymount to Carl Sandburg" and "acknowledged that the IEP was not clear in its proposal and the need for one-to-one support for transitions did not appear in the IEP or the prior written notice." *Id*. (citing Tr. 1001-03). They also assert that "Dr. Solomon agreed that the MCPS IEP did not specify that I.O. required a full-time one-to-one." *Id*. (citing Tr. 1134).

Yet, Plaintiffs, as well as Dr. Solomon, who was present at the CIEP meeting, have been aware of the language in the IEP that described the extent of the one-to-one support proposed for I.O. from the time they received the Prior Written Notice, which preceded the filing of their Due Process Complaint. Notably, the language calling for support "across all *academic settings*" differed from the language used elsewhere, such as the provision for "School Personnel/Parental Support" to be provided "[a]cross the *entire school day*." Oct. 23, 2015 IEP & Oct. 29, 2015 Prior Written Notice, P-47, at 48. Given this awareness, there is no reason why Plaintiffs could not have objected to this specific recommendation of the IEP and then raised in their Due Process Complaint the issue that the one-to-one aide provision was limited to academics and intended only to address aggression and did not specifically call for data collection every five minutes. But they did not.

Raising an issue in a due process complaint is the first step that the IDEA requires a plaintiff to take to exhaust the issue prior to filing suit in federal court. *See Z.G. ex rel. C.G. v. Pamlico Cty. Pub. Sch. Bd. of Educ.*, No. 17-1290, 2018 WL 3428696, at *4 (4th Cir. July 16, 2018).

---

intervention plans that schools have developed or just problems they're having with the schools in general around implementation of student IEPs.

*Id*. at 850:7–18.

> To resolve disputes concerning a student's right to a FAPE, the IDEA establishes a formal set of procedures that grant a plaintiff the right to file a civil action in federal court. *See* 20 U.S.C. § 1415(f), (g). Prior to bringing suit, however, a plaintiff must exhaust his administrative remedies. *See id.* § 1415(*l*). The plaintiff begins by filing a complaint with the local or state education agency regarding any matter concerning the child's education, as permitted under state law. *See id.* § 1415(b)(6). The filing of such a complaint creates a right to a preliminary meeting with school system officials. *Id.* § 1415(f)(1)(B)(i). If the grievance is not resolved at that meeting, the plaintiff may request a due process hearing in accordance with specific procedures established by the state. *Id.* § 1415(f)(1)(A).

*Id.*; *see also Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017) (noting that "the IDEA establishes formal procedures for resolving disputes," beginning with "a dissatisfied parent . . . fil[ing] a complaint as to any matter concerning the provision of a FAPE with the local or state educational agency (as state law provides)").

Significantly, "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [due process complaint] notice . . . unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B); *see also* 34 C.F.R. § 300.511(d) ("The party requesting the due process hearing may not raise issues at the due process hearing that were not raised in the due process complaint filed under § 300.508(b), unless the other party agrees otherwise."). *Cf.* 20 U.S.C. § 1415(b)(7)(A)(ii)(IV) (requiring "due process complaint notice" that includes "a description of the nature of the problem of the child relating to such proposed initiation or change, including facts relating to such problem"). In *Snyder ex rel. Snyder v. Montgomery County Public Schools*, this Court dismissed as unexhausted an IDEA claim that the plaintiffs "failed to allege in their initial hearing request . . . or their amended hearing request." No. DKC-08-1757, 2009 WL 3246579, at *6–7 (D. Md. Sept. 29, 2009). Citing Section 1415(f)(3)(B), the Court observed that "an allegation of an IDEA violation may only be presented in an administrative hearing if the allegation was set forth in the

hearing request notice required by 20 U.S.C. § 1415(b)(7), or if the parties at the administrative hearing agreed to the presentation and determination of additional issues." *Id.* at *6.

Here, as noted, Plaintiffs only contested placement in their Due Process Complaint. Moreover, at the due process hearing, when the ALJ inquired about the scope of her review, Plaintiffs' counsel stated that it was limited to placement, rather than seeking MCPS's consent to address the one-to-one aide support issue as well. Consequently, Plaintiffs failed to exhaust the level of one-to-one aide support issue, and it is not properly before this Court. *See* 20 U.S.C. § 1415(f)(3)(B); 34 C.F.R. § 300.511(d); *Snyder*, 2009 WL 3246579, at *6–7. Accordingly, what the 2015–2016 IEP requires is, as it states, "1:1 adult support for aggression" that is provided "[d]aily" and "[a]cross all academic settings," Oct. 23, 2015 IEP & Oct. 29, 2015 Prior Written Notice, P-47, at 23, and the only issue before me is whether the Student's placement at Carl Sandburg was reasonably calculated to provide her with the related services required by this IEP so that she received a FAPE.[6]

---

[6] Plaintiffs filed a Notice of Supplemental Authority to "direct the Court's attention to" *Z.B. v. District of Columbia*, 888 F.3d 515 (D.C. Cir. 2018). ECF No. 48. There, the court stated that the school district must evaluate a child and "understand[] the particulars of a child's current skills and needs," as the evaluation and understanding are "critical to developing an 'individualized' educational plan." *Z.B.*, 888 F.3d at 522, 523, 524. The court also noted that "the focus of a parent's IDEA claim and the courts' review is the IEP, not the school system's overall capacities." *Id.* at 526. This case from the United States Court of Appeals for the District of Columbia is not binding on this Court. Moreover, in *Z.B.*, the parents challenged whether the IEP, as written, was reasonably calculated to provide Z.B. with an appropriate education. *Id.* at 523, 527 ("Appellants challenge the 2014 IEP that DCPS offered to Z.B. at Hearst Elementary School as inadequate in several respects. Appellants contend that the IEP was substantively inadequate in the math and writing goals it set for Z.B., which they claim were too high given her current skill levels, and in lacking a reading goal, appropriate types and hours of instruction, specific executive functioning goals, and occupational therapy services. . . . Appellants also challenge the substantive adequacy of the 2015 IEP on the grounds that it lacked executive functioning goals for Z.B. and failed to provide appropriate types and hours of instruction."). Thus, *Z.B.* is not on point, given Plaintiffs' failure to exhaust their challenge to the IEP itself, as opposed to the placement. Accordingly, it does not affect the outcome of my analysis.

*Credibility of Witnesses and their Testimony*

Plaintiffs contend that "[t]he ALJ improperly credited the school system's witnesses over the parents' witnesses, ignoring key credibility issues and failing to properly weigh testimony." Pls.' Mem. 24. They argue that all of their witnesses were "knowledgeable and credible" and had "first-hand knowledge of I.O. and her needs," yet the ALJ (according to Plaintiffs) ignored their testimony that "Carl Sandburg would be inappropriate for her." *Id.* at 26–27. They insist that the ALJ "blindly rel[ied] on the school system's testimony that the proposed IEP was appropriate for I.O.," while "improperly ignor[ing] the school system's lack of knowledge of I.O." *Id.* at 26.

The issue is whether the ALJ's credibility determinations are "regularly made," because if they are, then they are due deference. *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *11 (D. Md. Dec. 29, 2014) (noting that, in *S.A. v. Weast*, 898 F. Supp. 2d 869, 874 (D. Md. 2012), this Court stated that it "owes deference to the ALJ's determinations of the credibility of witnesses" (whether explicitly or implicitly made) when it reviews IDEA cases). An ALJ's findings are "regularly made" when "they are reached through a process that is [within] the accepted norm of a fact-finding process." *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008). Thus, the findings are regularly made if the ALJ "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *Id.* The focus is process oriented—whether the presiding official resolved the factual disputes "in the normal way" that hearings are supposed to take place—rather than on "the manner in which the hearing officer expressed his view of the case." *Id.* Indeed, the Fourth

Circuit has held that a reviewing court cannot "reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility." *Doyle v. Arlington Cty. Sch. Bd.,* 953 F.2d 100, 104 (4th Cir. 1991) (quoting *McCrary v. Runyon*, 515 F.2d 1082, 1086 (4th Cir. 1975), *aff'd*, 427 U.S. 160 (1976); concluding that the reason given by the reviewing officer for the State Board of Education "for discrediting a witness who[m] he had not seen or heard testify, in the face of the crediting of that same witness by a hearing officer who had seen and heard the witness testify, [wa]s so far from the accepted norm of a fact-finding process designed to discover truth that . . . the due weight which should be accorded the decision of the reviewing fact-finding officer depending on that credibility decision [wa]s none").

Moreover, while the district court must "'explain its reasons for rejecting the findings of the hearing officer,'" the "IDEA hearing officer is not required to offer a detailed explanation of his or her credibility assessments." *S.A.*, 898 F. Supp. 2d at 877 (quoting *Cty. Sch. Bd. of Henrico Cty., Va. v. Z.P.*, 399 F.3d 298, 306 (4th Cir. 2005)). Thus, "a court should give deference even to a poorly explained administrative decision as long as the hearing officer used standard fact-finding methods." *S.T. ex rel. S.J.P.T. v. Howard Cty. Pub. Sch. Sys.*, No. JFM-14-00701, 2015 WL 72233, at *2 (D. Md. Jan. 5, 2015), *aff'd sub nom. S.T. v. Howard Cty. Pub. Sch. Sys.*, 627 F. App'x 255 (4th Cir. 2016). For example,

> [i]n *J.P.*, the Fourth Circuit held that the hearing officer's decision warranted deference even though the opinion did not explain what evidence the hearing officer found most important or why the officer was more persuaded by the school board's evidence. In fact, the court held that the decision was sufficiently detailed despite the fact that only two findings addressed issues in dispute, and these findings were as "about as bare-boned as they could be."

*S.A.*, 898 F. Supp. 2d at 876 (quoting *J.P.*, 516 F.3d at 262). Additionally, "the Fourth Circuit has consistently held that an ALJ's implicit credibility determinations are entitled to the same

deference as explicit findings." *Id.* at 877–78 (*citing Z.P.*, 399 F.3d at 307; *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 327–28 (4th Cir. 2004)).

The educators' opinions, also, are entitled to deference. *M.C.*, 2014 WL 7404576, at *11; *S.A.*, 898 F. Supp. 2d at 874 (noting that this Court "owes generous deference to educators" when it reviews IDEA cases). Indeed, the school district's "notions of sound educational policy" are entitled to considerable deference. *See M.M.*, 303 F.3d at 530–31; *Hartmann*, 118 F.3d at 999; *M.C.*, 2014 WL 7404576, at *6–7; *S.A.*, 898 F. Supp. 2d at 874. "[I]t is a longstanding policy in IDEA cases to 'afford great deference to the judgment of education professionals.'" *N.P. v. Maxwell*, 711 F. App'x 713, 717 (4th Cir. 2017) (quoting *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 517 (4th Cir. 2014)).

> At the same time, deference is based on the application of expertise and the exercise of judgment by school authorities. The Act vests these officials with responsibility for decisions of critical importance to the life of a disabled child. The nature of the IEP process, from the initial consultation through state administrative proceedings, ensures that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue. See §§ 1414, 1415; [*Rowley*, 458 U.S.] at 208–209, 102 S.Ct. 3034. By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement. A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances.

*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001–02 (2017).

At the administrative hearing in this case, Plaintiffs presented testimony from I.O.'s father, Dr. O.; "Dr. Laura Solomon, admitted as an expert in special education[;] Kristie Kim, admitted as an expert in school psychology[;] Marlene Kenny, Principal of Carl Sandberg [sic][;] Fonda Lowe, admitted as an expert in speech-language pathology"; and "Megan Boucher,

admitted as an expert in behavioral analysis." ALJ Dec. on Remand 10.[7]    The ALJ considered all of their testimony; indeed, she dedicated nine pages of her Decision on Remand to summarizing it. *Id.* at 26–35.  She noted Dr. O.'s and Dr. Solomon's preference for placement at Ivymount.  Specifically, it is undisputed that, at the time of the October 23, 2015 CIEP meeting, Dr. O. wanted I.O.'s placement to be at Ivymount, Jt. Stmt. Facts 3, and at the time of the June and July 2016 hearing, he still preferred Ivymount, because of "Dr. Solomon's recommendation, the progress that [the Parents have] seen at Ivymount," and "the intensity of the program at Ivymount."  July 6, 2016 Tr. 609:23 – 610:1; *see* ALJ Dec. on Remand 28.

Yet the ALJ also noted that Dr. O. was not familiar with Carl Sandburg beyond what he read on the Internet.  ALJ Dec. on Remand 28; July 6, 2016 Tr. 609:16–20.  And, based on Dr. O.'s testimony, the ALJ found that, in identifying a school for I.O., the Parents "did not identify any public schools," ALJ Dec. on Remand 27; *see* July 6, 2016 Tr. 628:1 – 630:6, and they applied to Ivymount and KTS and enrolled I.O. in KTS before moving to Maryland or contacting MCPS about public school options.  ALJ Dec. on Remand 27; *see* July 6, 2016 Tr. 637:16 – 638:13.  She found that "[i]t was [the Parents'] strong preference for Ivymount that drove the Parents' actions in this case.  From the very beginning, the Parents wanted the Student to attend Ivymount, their preferred school."  ALJ Dec. on Remand 39.  It is true that Dr. O. testified that the Parents "did not envision [their] daughter being in a typical public school classroom."  July 6, 2016 Tr. 630:25 – 631:1.  And, ten days after contacting MCPS for an IEP and placement in 2015, the Parents "signed a binding revised tuition contract with Ivymount School in the amount of $91,435.16 for that same '15-'16 school year."  *Id.* at 667:18–23.

---

[7] Additionally, Plaintiffs offered more than seventy exhibits into evidence, as did MCPS.  ALJ Dec. on Remand 3–10.

The ALJ concluded that Dr. Solomon, as the "paid advocate" whom the Parents had "hired . . . to assist with the 'placement process' for MCPS *after* they had secured the Student's placement at Ivymount," shared that bias.   ALJ Dec. on Remand 40–41 (emphasis added). Therefore, the ALJ did not "place significant weight on her evaluation of the Carl Sandberg [sic] program."   *Id.* at 41.   Contrary to Plaintiffs' argument, *see* Pls.' Mem. 28, the ALJ properly considered that the Parents retained Dr. Solomon as an advocate.   *See M.L. v. Smith*, No. PX-16-3236, 2018 WL 3756722, at *7 (D. Md. Aug. 7, 2018) (concluding that ALJ "conducted a proper hearing, the determinations from which are entitled to deference," including the ALJ's decision to "accord[] educational consultant Jennifer Fisher's testimony less weight because [inter alia] 'she was hired by the parents as an educational consultant and advocate'").

Moreover, the ALJ found that "[w]hile Dr. Solomon had visited Carl Sandberg [sic] on several occasions in her role as a special education consultant, she is not affiliated with the school or particularly knowledgeable of its programs," and, more significantly, "her strong bias in favor of Ivymount and against Carl Sandberg [sic] was inherent in her testimony." ALJ Dec. on Remand 40.  The ALJ reasoned:

> Dr. Solomon testified that she has had a close working relationship with Ivymount throughout her career.   She holds the program in high regard.   Dr. Solomon repeatedly asserted her belief that the Carl Sandberg [sic] program was inferior to Ivymount's program.   Indeed, she explained how Ms. Kenny appreciated her criticisms and guidance when she visited the school during her observation following the CIEP meeting.   On this issue, I find it significant that Dr. Solomon did not have a single positive opinion on any aspect of the Carl Sandberg [sic] program.   She even extended her criticisms to Carl Sandberg's [sic] labeling of its time-out rooms, and suggested that no child could be appropriately placed at Carl Sandberg [sic] based on her experience with two other students who she recommended be moved to other schools.   The best compliment that Dr. Solomon afforded to Carl Sandberg [sic] was that "it's a fine program" where she has had students placed.

*Id.* at 41; *see* June 20, 2016 Tr. 47:19 – 48:1, 113:24 – 114:2, 191:7–12. She observed that, in contrast, "Dr. Solomon described Ivymount . . . 'like fine wine.'" ALJ Dec. on Remand 41 (quoting June 20, 2016 Tr. 111:19–23).

Dr. O. also testified that, after visiting Carl Sandburg with Dr. Solomon, Mrs. O. "said that the principal had stated that she didn't think that the IEP could be implemented completely at Carl Sandburg." July 6, 2016 Tr. 607:6–8. Dr. Solomon, recalling the same conversation, testified that she had asked if, after observing I.O. at Ivymount, Ms. Kenny had "concerns, [would she] share that information with the central IEP team," and the principal "said absolutely not." June 20, 2016 Tr. 189:11–17. Noting the inconsistency in this testimony, the ALJ rejected it and instead found Principal Kenny's "belief that her statements regarding the nature of a public school, to not turn away students sent to the school, were misconstrued" to be a reasonable explanation. ALJ Dec. on Remand 46 & n.14.

Certainly, Dr. Solomon testified about Ivymount's approach to behavior management and data collection, *e.g.*, June 20, 2016 Tr. 154:24 – 155:13, which she viewed as a "critically important" tool "for meeting [I.O.'s] needs." June 21, 2016 Tr. 332:7–20. And, Dr. Solomon opined that I.O.'s needs could not be met without the approach to behavior that Ivymount takes and which, she believed, Carl Sandburg could not take. *Id*. at 336:1–11. She also questioned Carl Sandburg's "staffing." Dr. Solomon email to Parents, P-52. Yet, significantly, the IEP itself—to which the Parents agreed and which the Parents did not challenge in their Due Process Complaint—did not call for the level or method of data collection that Ivymount employed. 2015–2016 IEP, P-47. In short, the ALJ's reasoning demonstrates that her process for assigning little weight to Dr. Solomon and Dr. O's testimony was within "the accepted norm of a fact-finding process," *J.P.*, 516 F.3d at 259, and therefore entitled to deference. *See M.C.*, 2014 WL

7404576, at *11; *S.A.*, 898 F. Supp. 2d at 874. Further, as the reviewing Court, this Court cannot reverse the ALJ's regularly-made credibility determinations. *See Doyle*, 953 F.2d at 104.

Plaintiffs insist that Ms. Lowe, Ms. Boucher, and Ms. Kim all provided testimony "that Carl Sandburg would be inappropriate for [I.O.]," Pls.' Mem. 26–27, but they do not cite any testimony in support of their assertion. Ms. Lowe's testimony certainly showed her familiarity with I.O. after regular classroom observations and staff meetings at Ivymount, as well as an earlier observation at KTS, and she also testified about I.O.'s problem behaviors and Ivymount's interventions. July 6, 2016 Tr. 457:7 – 462:15. Additionally, she testified that Ivymount was "an appropriate program" for I.O., *id.* at 477:13–18, and that I.O. "needs the kind of programming that Ivymount provides," *id.* at 481:5–8. But Plaintiffs' counsel specifically stated at the hearing that Ms. Lowe "was not [at the hearing] to testify about any opinion about Carl Sandburg," and Ms. Lowe stated that she was not asked about Carl Sandburg at the October 23, 2015 CIEP meeting either. *Id.* at 479:16–17. Thus, while she testified in favor of placement at Ivymount, she did not testify against placement at Carl Sandburg. Significantly, the issue is not whether placement at Ivymount would be appropriate but rather whether placement at Carl Sandburg was appropriate.

Ms. Boucher also established her familiarity with I.O., having supervised the behavior analyst assigned to the Student at Ivymount beginning in July 2015, and then worked directly as the Student's behavior analyst, beginning in Spring 2016 and extending into July 2016. July 7, 2016 Tr. 705:11–25, 711:16–13:18. She testified that I.O.'s profile is "the kind of profile that ABA [Applied Behavior Analysis] addresses" and testified about ABA systems that were "appropriate for" and "benefitted" I.O. *Id.* at 716:18–20, 729:4–9. She also described the number of instructors and therapists provided for students at Ivymount. *Id.* at 721:2–20. And,

she discussed data collection regarding the Student at Ivymount. *Id*. at 730:12 – 733:18. Ms.

Boucher testified that the data collection and analysis has "been necessary to benefit [I.O.]." *Id*.

at 779:24 – 780:2. Notably, when asked to review the "supplementary aids and services" in the

October 23, 2015 IEP developed by MCPS, Ms. Boucher stated that they "look identical to the

Ivymount IEP," *id*. at 829:18–25, and "are consistent with ABA practices," *id.*at 830:6–7. She

stated that the provision for "one-to-one adult support for aggression" was "ABA consistent" and

would permit MCPS "to do other things that are consistent with ABA." *Id*. at 830:6 – 831:18. In

contrast to this in-depth testimony about Ivymount, she acknowledged that she did not "know

anything about Carl Sandburg." *Id*. at 839:1. Thus, she, also, was unqualified to testify that

placement at Carl Sandburg would be inappropriate. *See id.*

> With regard to Ms. Kim's testimony, Plaintiffs argue:

> There was considerable testimony from all witnesses about the opinion of Ms.
> Kim, which was ultimately ignored by Mr. Moore [at the CIEP meeting] after he
> reprimanded her for voicing her concerns with the Carl Sandburg placement. Tr.
> at 178-79, 544-46, 597-99. Mr. Moore offers no explanation for *why* Ms. Kim's
> opinion was not given more weight, even after she observed Carl Sandburg *and
> had the same concerns.*

Pls.' Mem. 29. It is true that, at the October 23, 2015 CIEP meeting, Ms. Kim, who had not

visited Carl Sandburg and "based [her] concerns on what [she] heard about Sandburg," had

"concerns about the level of support that [the Student] needs and wasn't sure if Sandburg would

be able to provide that." June 21, 2016 Tr. 358:4–6, 359:19–22, 369:9–11. But she visited the

school after the meeting and, after visiting, she acknowledged that "Ms. Middleton [Carl

Sandburg's psychologist] has much more knowledge about the program at Carl Sandburg than

[she does]," and Ms. Kim "would defer to her about what services they would be able to offer."

*Id.* at 368:21 – 369:3. Thus, notwithstanding any concerns that she may have had, Ms. Kim did

not testify that I.O.'s placement at Carl Sandburg would be inappropriate.

As for Principal Kenny, she did tell Dr. Solomon and Mrs. O. that Carl Sandburg does not "have the level of staffing as what [she] underst[oo]d Ivymount to have," June 21, 2016 Tr. 381:22–24, and that "it was [her] understanding that Ivymount has a one-to-one for each child," which "Carl Sandburg cannot provide," *id.* at 409:13–22. Nonetheless, she testified that Carl Sandburg could implement I.O.'s 2015–2016 IEP. July 11, 2016 Tr. 1080:14 – 1081:10. As for "provid[ing] for one-to-one support for aggression across all academic settings," Principal Kenny said: "This speaks to the point of whether or not [I.O.] would be given enhanced staffing at the central IEP process and my understanding . . . was that that would occur. So, yes." *Id.* at 1083:7–15. But it is important to keep in mind that the IDEA does not require a public school to provide educational services that are "ideal" or even equivalent to those found in a private school; it simply requires that a student's IEP and placement be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017); *see also Wagner v. Bd. of Educ. of Montgomery Cty., Md.*, 340 F. Supp. 2d 603, 606 (D. Md. 2004) ("The IDEA does not require that a school district provide a disabled child with the best possible education, *Rowley*, 458 U.S. at 192, 102 S.Ct. 3034, or that the education maximize each child's potential, *see Hartmann v. Loudoun County Bd. of Educ.,* 118 F.3d 996, 1001 (4th Cir. 1997)."). Thus, Principal Kenny's testimony supported placement at Carl Sandburg. *See id.* In sum, the ALJ provided well-reasons explanations for assigning little weight to the testimony of the two witnesses—Dr. O. and Dr. Solomon—who testified that Carl Sandburg could not meet I.O.'s needs, and she did not disregard testimony against placement at Carl Sandburg from Plaintiffs' other witnesses, as they did not provide testimony to that effect.

In its case, MCPS offered additional testimony from Ms. Kenny, admitted as an expert in special education, as well as George Moore, who was "admitted as an expert in special education with an emphasis on the educational placement of special needs students." July 7, 2016 Tr. 861:7–9. Mr. Moore testified that Carl Sandburg could implement I.O.'s IEP. *Id.* at 919:6–10. Plaintiffs assert that, following *Endrew F.*, for school system officials' decisions to "warrant[] the sort of deference [they] traditionally" receive—the deference that, in Plaintiffs' view, the ALJ accorded to Mr. Moore's placement decision—, there must be evidence "that they have applied their expertise and adequately justified their decisions." Pls.' Mem. 8 (citing *Endrew F.*, 137 S. Ct. at 1000–02; *see also id.* at 24–25. In Plaintiffs' view, such evidence is lacking. *Id.* at 18, 26. Plaintiffs insist that, "[w]here there is no indication that the school officials' expertise has been brought to bear on the individual needs of the handicapped child, however, the deference granted will be commensurately lower." *Id.* at 25 (quoting *McKenzie v. Smith*, 771 F.2d 1527, 1535, n. 17 (D.C. Cir. 1985)).

Not so. Principal Kenny provided a "cogent and responsive explanation" for her view that Carl Sandburg could implement I.O.'s IEP, entitling her opinion to deference. *See Endrew F.*, 137 S. Ct. at 1002. She testified that she had "undertaken a detailed review of [I.O.'s] file." July 11, 2016 Tr. 1071:25 – 1072:2. For example, she had reviewed a "March 31, 2000 neuropsychological evaluation" of I.O. and found that Carl Sandburg's services met the recommendation in that report, as Carl Sandburg provides "100 percent special education" that is "highly structured" with "related services [that] are primarily integrated into the classroom," a "low student-to-teacher ratio" and "social skills training." *Id.* at 1072:6–21. She also stated that Carl Sandburg provides "frequent reminders of rules and expectations," "[s]mall group," "conversation and joint attention," an incentives system similar to a point system, and

preparation for transitions, which I.O.'s third grade teacher identified as components of "the type of program she believes that [I.O.] requires." *Id.* at 1072:22 – 1075:1.  She noted that, while Carl Sandburg does not use the term "one-to-one dedicated aide," the school does "have enhanced staffing if the child required that."  *Id*. at 1074:17–22. The principal stated that I.O.'s neuropsychological and achievement profiles were consistent with those of Carl Sandburg students.  *Id*. at 1075:22 – 1076:6, 1079:9–13, *see also id.* at 1081:16–21 (IEP goals are "typical").  Additionally, she expressed no doubt that, having reviewed the 2015–2016 IEP, Carl Sandburg "would be able to implement it." *Id*. at 1080:14 – 1081:10.

As for Mr. Moore, he testified that, at the October CIEP meeting, the IEP team "had [a] thorough discussion about [I.O.'s] strengths and weaknesses and what her needs were" and they "identified those services" she needed. July 7, 2016 Tr. 914:8–12.  He explained that the team "had to rule out public options first and . . . Carl Sandburg was a public option that had to be considered." *Id.* at 914:16–19.  Mr. Moore noted that "Ms. Middleton, the school psychologist who attended the meeting, after we went through a series of discussions, agreed that Sandburg could implement the IEP." *Id.* at 914:20–23.

With regard to why he "believe[d] that Carl Sandburg learning center could meet the agreed-upon goals and objectives of the October 23, 2015, IEP," *id.* at 916:5–7, he testified:

> Carl Sandburg is like the multiple needs program, learning needs program, has a dual track, kids can earn a diploma, they can earn a certificate. Carl Sandburg has very small classes. We've heard that there are seven to 10 students in a class and three staff. If there are additional aid[e]s like in this case [I.O.] had additional aid[e]s for the transition and for her alleged aggression, Carl Sandburg has the speech pathologist, two and a half speech -- last year it was two and a half speech pathologists on site, psychologists on site, O.T. on site, so all the services are right there at Carl Sandburg, just as they are at Ivymount. Plus Carl Sandburg delivers the Montgomery County Public School curriculum in full, modified and adapted, yes, but the Montgomery County Public School's curriculum.

*Id.* at 916:8–24. Mr. Moore noted that I.O.'s "learning profile is consistent" with the learning profiles of other Carl Sandburg students," and "[h]er behavior profile is consistent and there have been children who we have referred to Sandburg who have more behavioral needs and there is some who have had more academic needs than she." *Id.* at 918:21–919:4. In his opinion,

> it was no doubt that Carl Sandburg could implement the IEP based on my knowledge of both programs and also based on the fact the school psychologist who had heard the entire discussion felt that Carl Sandburg could implement the IEP. She certainly knew Carl Sandburg better than I did and I have a pretty good knowledge of it, so if we both thought that, I had no concerns about supporting -- or recommending that placement since we didn't have consensus.

*Id.* at 919:6–14. Thus, he also provided a "cogent and responsive explanation" for his view that Carl Sandburg could implement I.O.'s IEP, such that his opinion, also, was due deference. *See Endrew F.*, 137 S. Ct. at 1002.

Consequently, after the ALJ properly afforded little weight to Dr. O. and Dr. Solomon's testimony against placement at Carl Sandburg, the record before the ALJ included one opinion as to placement at Carl Sandburg, shared by Principal Kenny and Mr. Moore—that Carl Sandburg could implement the Student's IEP. Both opinions deserved due deference. Accordingly, the ALJ did not err with regard to her credibility determinations and assessment of witness testimony.

### ALJ Decision on Remand and Deference Due

To obtain court-ordered reimbursement for the Student's private education, Plaintiffs first must demonstrate that "the public school system failed to provide a free appropriate public education." *Carter ex rel. Carter v. Florence Cty. Sch. Dist. Four*, 950 F.2d 156, 161 (4th Cir. 1991) (stating that, if plaintiffs establish the first element, the second element to prove is that "the private school chosen by the parents did provide an appropriate education to the child").

Plaintiffs argue that, following *Endrew F.*, an IEP must be reasonably calculated to provide for "functional advancement," not just academic progress, and the progress must be "appropriate in light of the child's circumstances." Pls.' Mem. 9 (quoting *Endrew F.*, 137 S. Ct. at 999). Here, as noted, Plaintiffs only exhausted their challenge to I.O.'s placement at Carl Sandburg, and therefore the only issue is whether the ALJ properly concluded that Carl Sandburg could implement the IEP.

Plaintiffs argue that "[t]he ALJ's decision is not entitled to deference," *id.* at 4, because the ALJ was "'neither thorough nor careful' as evidenced by the fact that, 'the ALJ didn't address all issues and disregarded some of the evidence presented at the hearing,'" *id.* at 6 (quoting *M.C. ex rel. M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194–95 (9th Cir. 2017)). In their view, there was "overwhelming" evidence that "MCPS failed to propose a program appropriate in light of I.O.'s circumstances," all of which the ALJ ignored. *Id.* at 9. Specifically, they contend that the ALJ should have considered the "evidence of I.O.'s lack of progress in response to the programming at KTS," because that programming "was similar in nature to the MCPS proposed placement at Carl Sandburg," and "I.O.'s positive response to and progress at Ivymount" should have been considered because, as Plaintiffs read it, *Endrew F.* "stresses the importance of considering a student's progress over time, including before *and after* the IEP in question." *Id.* (citing *Endrew F.*, 137 S. Ct. at 996) (emphasis added).

In Plaintiffs' view, "[t]he difference between the KTS program and Ivymount comes down to its approach to addressing and managing behavior," with Ivymount collecting data on I.O.'s behavior every five minutes and, one time, providing "reinforcement every minute." Pls.' Mem. 11. Plaintiffs assert that Dr. Solomon testified that "this type of data collection is critical

27

for addressing I.O.'s behavior," and she, along with Ms. Lowe, "explained the similarities between the MCPS proposed program at Carl Sandburg and what was already tried at KTS, especially from a behavioral management standpoint," specifically, the lack of frequent data collection. *Id.* at 12. Additionally, Plaintiffs insist that the ALJ needed to, but did not, consider I.O.'s "actual educational progress" at Ivymount. *Id.* at 14–15.

The ALJ concluded that "the decision to place the Student at Carl Sandberg [sic] was based on competent evidence which established that the placement provided the Student with a FAPE." ALJ Dec. on Remand 51–52. I agree. Significantly, "[t]he goals contained in an IEP are the standard against which any proposed placement is measured." *Wagner v. Bd. of Educ. of Montgomery Cty., Maryland*, 340 F. Supp. 2d 603, 613 (D. Md. 2004); *see also* 34 C.F.R. § 300.116(b)(2) ("The child's placement . . .[i]Is *based on the child's IEP*." (emphasis added)); Code Md. Regs. tit. 13A, § 05.01.10(C)(1)(a)(iv) (requiring that "[t]he educational placement decision of a student with a disability is . . . *[b]ased on the student's IEP*") (emphasis added). *Cf.* 34 C.F.R. § 300.114(b)(1)(ii) ("A State must not use a funding mechanism by which the State distributes funds on the basis of the type of setting in which a child is served that will result in the failure to provide a child with a disability FAPE according to the unique needs of the child, *as described in the child's IEP*." (emphasis added)); Code Md. Regs. tit. 13A, § 05.01.16(A)(1)–(2) (providing that, "*[i]f a student's IEP cannot be implemented* in a public school program, the local school system shall take steps . . . to ensure that the student is provided FAPE" through "placement of [the] student with a disability in a nonpublic school" (emphasis added)). Principal Kenny testified that Carl Sandburg could implement the 2015–2016 IEP. July 11, 2016 Tr. 1080:14 – 1081:10. Mr. Moore testified that Carl Sandburg could implement the 2015–2016 IEP. July 7, 2016 Tr. 919:6–10. It is undisputed that Carl Sandburg's school psychologist, Ms.

Middleton, stated at the CIEP meeting that Carl Sandburg could implement the 2015–2016 IEP. Jt. Stmt. Facts 3. Insofar as the Father and Dr. Solomon questioned Carl Sandburg's ability to implement the 2015–2016 IEP, as discussed, I defer to the ALJ's assignment of little weight to that testimony.

Certainly, there was evidence that Carl Sandburg's behavioral supports and data collection are similar to KTS's and inferior to Ivymount's. But, to the extent that the Parents contend that Carl Sandburg cannot provide a FAPE to I.O. because it cannot collect data every fifteen minutes or provide the same level of support as Ivymount, this is a challenge to the IEP itself—not the location where it was to be implemented. As discussed, Plaintiffs only exhausted their administrative remedies with regard to placement, not as to the contents of the IEP itself. And, the IEP did not require data collection at specific intervals or the continuous one-to-one supports that Ivymount provides. Rather, the IEP required "full-time self-contained special education in a small setting with behavior support and one hour per week of Speech and Language services, and one-to-one adult support for aggression across all academic areas." Jt. Stmt. Facts 3.

Plaintiffs argue that the Court also should consider evidence that, approximately two years after the October 23, 2015 decision to place I.O. at Carl Sandburg, MCPS agreed to place I.O. at Ivymount. *See* Pls.' Mem. 34 & n.8. They provide an affidavit from Dr. Solomon, who stated that, at an August 16, 2017 IEP meeting regarding I.O.'s IEP and placement for the 2017–2018 school year, the CIEP team "considered I.O.'s progress over the last several years at Ivymount" and "determined that the appropriate placement for I.O. for the 2017-18 school year is Ivymount." Solomon Aff. ¶¶ 4–6, ECF No. 41-2; *see also* Dr. O. Aff., ECF No. 41-3 (noting I.O.'s 2017–2018 placement at Ivymount).

As Plaintiffs assert,

> Pursuant to the IDEA, "the court… *shall hear additional evidence* at the request of a party." 20 U.S.C. § 1415 (i)(2)(C)(ii)(emphasis added). One example of acceptable "additional evidence" is evidence "concerning relevant events occurring subsequent to the administrative hearing." *Town of Burlington v. Dep't of Educ. for Com. of Mass.,* 736 F.2d 773, 790 (1st Cir. 1984), *aff'd sub nom. Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985).

Pls.' Mem. 34 n. 8; *see* Defs.' Opp'n & Mem. 35 (agreeing with this standard). Plaintiffs insist that the affidavits they offer are "highly relevant to the case" because they "address[] actions taken by MCPS and the placement of I.O. by MCPS at Ivymount just two years after its decision not to place her at Ivymount and to propose Carl Sandburg." Pls.' Reply & Opp'n 18.

I have considered this evidence, but having reviewed the Fourth Circuit's helpful guidance in *Schaffer v. Weast*, 554 F.3d 470 (4th Cir. 2009), I discount it. In *Schaffer*, the plaintiffs insisted that an IEP from two years after the IEP at issue was "decisive" evidence that the student "had a severe auditory processing problem and needed small classes all along." 554 F.3d at 475. The Fourth Circuit rejected this argument, noting that the district court did consider the evidence but "properly exercised its discretion to discount that evidence because the evidence promoted a hindsight-based review that would have conflicted with the structure and purpose of the IDEA." *Id.* The court noted that, had the district court given the evidence the plaintiffs believed it deserved, the court could have "overturned the ALJ's original decision based on evidence that did not even exist at the time that the school district's decision was made," which would have prevented the administrative proceeding from "receiv[ing] the weight that [it is] due." *Id.* at 476. It reasoned:

> Judicial review of IEPs under the IDEA is meant to be largely prospective and to focus on a child's needs looking forward; courts thus ask whether, at the time an IEP was created, it was "reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034; *Burlington,* 736 F.2d at 788; *Adams v. Oregon,* 195 F.3d 1141, 1149 (9th Cir.1999). But this

prospective review would be undercut if significant weight were always given to evidence that arose only after an IEP were created. *Cf. Bernardsville Bd. of Educ. v. J.H.,* 42 F.3d 149, 161 (3d Cir.1994) (affirming the district court's conclusion that evidence of a later IEP was "irrelevant to the issue of the appropriateness of" prior IEPs). Judicial review would simply not be fair to school districts, whose decisions would be judged in hindsight "based on later assessments of a student's needs at [a] later point in time." *Brief for Appellees* at 28; *see also Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 762 (3d Cir.1995). And more importantly, if services added to a later IEP were always used to cast doubt on an earlier one, school districts would develop a strong disincentive against updating their IEPs based on new information. This scenario is the exact opposite of what Congress intended when it provided for regular review and revision of IEPs, *see* 20 U.S.C. § 1414(d)(4)(A), and it would do little to help the interests of disabled children.

*Id.* at 477. Moreover, students needs can change over time, and "interpret[ing] [a later] IEP as an admission of fault as to [an earlier] IEP would discourage MCPS and other school systems from reassessing and updating IEPs out of fear that any addition to the IEP would be seen as a concession of liability for an earlier one." *Id.* at 478.

Here, there is no evidence that I.O.'s educational needs and abilities were static. Consequently, her 2017–2018 IEP and placement were not relevant to her 2015–2016 IEP and placement. And, to consider the 2017–2018 placement would require me to adopt the retrospective "hindsight" analysis rejected by the Fourth Circuit in *Schaffer*, which would undermine the IEP process and could "discourage MCPS and other school systems from reassessing and updating IEPs out of fear that any addition to the IEP would be seen as a concession of liability for an earlier one." *Schaffer*, 554 F.3d at 478. Further, as Defendants note, at the time MCPS placed I.O. at Ivymount, she had "aged out [of Carl Sandburg] as a rising sixth-grader." Defs.' Opp'n & Mem. 39; *see also* Pls.' Reply & Opp'n 18 n.5 (acknowledging this fact). Thus, Carl Sandburg was no longer an option for the 2017–2018 school year. Accordingly, while I have considered the Plaintiffs' additional evidence, I do not assign any weight to it. *See Schaffer*, 554 F.3d at 478.

Therefore, the ALJ did not err in concluding that placement at Carl Sandburg was reasonably calculated to provide the Student with a FAPE. Moreover, having conducted a *de novo* review of the record, I independently reach the same conclusion that Carl Sandburg could implement the IEP, and consequently, I.O.'s placement was appropriate.[8]

Plaintiffs have not shown that, as a result of the placement at Carl Sandburg, the Student would not have access to a FAPE. "[T]he insistence of parents that a non-public school setting is more appropriate does not establish the inappropriateness of the public school, even if the child would have benefitted more in the private setting." *Endrew F.*, 137 S. Ct. at 999. As the ALJ explained in her well-reasoned decision, the Student's proposed placement in public school was

---

[8] Insofar as Plaintiffs challenge the placement based on Mr. Moore's alleged "reprimand" of Ms. Kim during the CIEP meeting and/or a failure to explain the decision properly during that meeting, any error would be procedural. It is true that procedural violations may amount to an IDEA violation if they "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child." 20 U.S.C. § 1415(f)(3)(E)(ii)(II).

Yet, "a violation of a procedural requirement of the IDEA (or one of its implementing regulations) must actually interfere with the provision of a FAPE before the child and/or his parents would be entitled to reimbursement relief [for private educational assistance]." *DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester Cty.*, 309 F.3d 184, 190–91 (4th Cir. 2002); *see also M.C.E. ex rel. T.Q.A. v. Bd. of Educ. of Frederick Cty.*, No. RDB-09-3365, 2011 WL 2709196, at *8 (D. Md. July 11, 2011) (observing that, "[u]nder the Individuals with Disabilities Education Act, a procedural violation is only actionable if it interferes with a provision of the student's free appropriate public education," because otherwise "'these violations are not sufficient to support a finding that an agency failed to provide a free appropriate public education'" (quoting *DiBuo*, 309 F.3d at 190)). This is true "even when the procedural violation 'interfere[s] with the parents' ability to participate in the development of their child's IEP.'" *M.C.E.*, 2011 WL 2709196, at *8 (quoting *DiBuo*, 309 F.3d at 190–91); *see also R.F. v. Cecil Cty. Pub. Sch.*, No. ADC-17-2203, 2018 WL 3079700, at *8 (D. Md. June 21, 2018) (same). Therefore, "ordinarily, procedural violations of the IDEA are subject to a harmlessness analysis." *M.C.E.*, 2011 WL 2709196, at *8; *see also A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 679 n.7 (4th Cir. 2007) (noting that a procedural violation is "subject to harmlessness analysis [unlike] a substantive violation"). Here, any procedural violation was harmless because placement at Carl Sandburg was, indeed, reasonably calculated to meet I.O.'s needs and provide a FAPE. *See R.F.*, 2018 WL 3079700, at *12.

reasonably calculated to provide her with a FAPE for the 2015–2016 school year. Therefore, Plaintiffs are not entitled to judgment as a matter of law, whereas Defendants are.

## **ORDER**

Accordingly, it is, this 24th day of September, 2018, hereby ORDERED that

1.  Plaintiffs' Motion for Summary Judgment, ECF No. 41, IS DENIED;

2.  Defendants' Motion for Summary Judgment, ECF No. 43, IS GRANTED; and

3.  The Clerk IS DIRECTED to CLOSE THIS CASE.


_____/S/_____
Paul W. Grimm
United States District Judge

lyb